IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHARTER OAK FIRE INSURANCE COMPANY and ST. PAUL FIRE AND MARINE INSURANCE COMPANY,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>INTERFACE PERFORMANCE MATERIALS, INC., et al,<br><br>　　　　　Defendants. | CIVIL ACTION<br>NO. 17-4685 |

**MEMORANDUM**

**Schmehl, J**    /s/ JLS                                                                   October 25, 2018

**I. INTRODUCTION**

In this insurance coverage dispute, Plaintiffs, The Charter Oak Fire Insurance Company and St. Paul Fire and Marine Insurance Company ("the Insurer"), argue that an "aircraft exclusion" contained in the two policies issued to Defendants, Interface Performance Materials, *et al*, ("Interface") relieves them of their duty to provide coverage to Defendants in a separate lawsuit involving a tragic plane crash and an allegedly defective aircraft part.

**II. BACKGROUND**

The underlying lawsuit stems from a plane crash that occurred on August 18, 2013, in Kansas City, Missouri which resulted in the death of Mr. and Mrs. Lallo. (Complaint, ¶ 18-20.) Interface is a party to the underlying litigation because an aircraft part known as a "gasket" was

discovered in the rubble of the crash with the word "Interface" stamped on it.[1] (Defendants' Statement of Undisputed Facts, ¶ 32.) The underlying complaint specifically alleges that Interface "designed, manufactured, tested, inspected, trained, advertised, marketed, warranted, distributed, licensed, sold, supplied, overhauled and/or rebuilt gaskets and gasket materials used to interface between the magneto and engine accessory case."[2] (Compl, ¶ 26.) When Interface requested coverage for the underlying lawsuit from the Insurer, the Insurer denied coverage and based that denial on an aircraft exclusion contained in the insurance agreements. (Docket No. 34, Exh. 10 and 11.)

Interface and the Insurer have two insurance agreements and both are in dispute here. *See* (Compl, ¶ 32-40.). The first agreement is a typical comprehensive commercial insurance policy, and the second is an umbrella policy that provides excess coverage for occurrences surpassing the commercial policy's retained limit. The pertinent parts of the commercial policy read:

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

   \*   \*   \*

21. "Your Product"

---

[1] It was later discovered that Interface sold raw materials to its customer "Corley Gasket," who sold a gasket to "Superior Air Parts," who then sold a gasket to "Quality Aircraft Accessories," who ultimately provided the gasket for the aircraft in question.

[2] Additional allegations are brought against Interface. However, all allegations are similar in that they allege that Interface was in the chain of production, manufacturing or distribution for the aircraft's gasket. *See* Compl, ¶ 21-31.

a. Means:

   1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      a. You;
      b. Others trading under your name; or
      c. A person or organization whose business or assets you have acquired; and

   2) Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

   \*   \*   \*

**Exclusions – Aircrafts Products and Grounding**

   \*   \*   \*

2. The Following is added to the **DEFINITIONS** section:
"Aircraft Product" means:

   a. Aircraft, including missile or spacecraft, and any ground support or control equipment used with any aircraft, missile or spacecraft;

   b. Any of "your products" manufactured for, used in connection with, or incorporated into aircraft, aircraft parts, aircraft equipment or aircraft accessories, including ground handling tools and equipment;

   c. Any of "your products" used for the purpose of guidance, navigation or direction of aircraft, whether an aircraft is in flight or on the ground; or

   d. Training aids, navigation charts, navigation aids, manuals, blueprints, engineering or other data or advice, services and labor relating to such aircraft or products.

"Grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, by reason of the actual, alleged or

suspected existence of any defect, fault or condition in such aircraft of any part thereof:

    a. Sold, handled or distributed by the insured; or

    b. Manufactured, assembled or processed by any other person or organization:

        1) According to specifications, plans, suggestions, orders or drawings of the insured; or

        2) With tools, machinery or other equipment furnished to such persons or organizations by the insured;

Whether such aircraft so withdrawn or restricted are owned or operated by the same or different persons or organizations.

(Docket No. 1, Exh. B.) In its motion for judgment on the pleadings, the Insurer argues that this aircraft exclusion unambiguously relieves it of its duty to provide coverage to Interface because Interface's alleged liability in the underlying lawsuit is based solely on its involvement with an aircraft part. (Docket Nos. 33, 39.) In its motion for partial summary judgment, Interface argues that the underlying lawsuit contains coverage-triggering allegations, and the lawsuit is meritless, requiring the Insurer to provide coverage. Alternatively, Interface argues that the Insurer has failed to meet its burden of proving that the aircraft exclusion applies. (Docket Nos. 34, 40.)

## III. DISCUSSION

Interface moves for partial summary judgment under FRCP 56. Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed R. Civ. Proc. 56(a). "A motion for summary judgment will not be defeated by the 'mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 585 F.3d 575, 581 (3d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The Insurer moves for judgment on the pleadings under FRCP 12(c). Under Rule 12(c), judgment is granted when "the movant clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988) (citations omitted).

"A court's first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage." *General Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089 (Pa. 1997). The interpretation of an insurance contract is a question of law in which the court must give effect to the plain language of the contract in its entirety. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (citations omitted). If the policy language is ambiguous, the provision must be construed in favor of the insured. *Id.* (citing *Med. Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999); *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 174 (Pa. 2005)). Policy language is ambiguous when it is reasonably susceptible to more than one construction and meaning. *401 Fourth St., Inc.*, 879 A.2d at 171 (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999)). Still, policy language may not be stretched beyond its plain meaning to create an ambiguity. *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2008). While insurance policies will be construed against the insurer, the insured must still show that their claim falls "within the coverage provided by the policy." *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966) (citations omitted). Then, "[a] defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it." *Id.* (citations omitted).

5

"After determining the scope of coverage, the court must examine the complaint in the underlying action to ascertain if it triggers coverage." *General Accident Ins. Co. of Am.*, 692 A.2d at 1095. An insurer's duty to defend, which "also carries with it a conditional obligation to indemnify," is a legal question based within the four corners of the policy and the four corners in the underlying complaint. *Id.* "An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy." *Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc.*, 2A.3d 526, 541 (Pa. 2010).

In addition to the contents of the underlying complaint, Interface asks me to consider emails, testimony and other evidence in order to determine the scope of the Insurer's coverage. Interface argues that this new analytical approach to the four corners doctrine is appropriate based upon *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660 (3d Cir. 2016.) *Ramara* set forth a unique analytical approach to the four corners doctrine, but that approach explicitly addressed cases involving the Pennsylvania Workers' Compensation Act and therefore has no relevance here. *Id.* at 680. Further, the Third Circuit emphasized that "in affirming the District Court's analytical approach we do not intend our opinion to be read as an expansion or modification of Pennsylvania's strict interpretation of the four corners rule. Indeed, inasmuch as we are applying Pennsylvania law we could not do so." *Id.* at 679 (citations omitted). Nonetheless, *Ramara* reiterated the "obvious: an insurer cannot bury its head in the sand and disclaim any knowledge of coverage-triggering facts." *Id.* at 680.

Interface would be entitled to insurance coverage had the policy not contained an aircraft exclusion. However, I find that the Aircraft Products & Grounding exclusion unambiguously precludes the Insurer from providing coverage to Interface. The underlying complaint alleges

6

that Interface was a part of the chain of production, manufacturing or distribution of the plane's allegedly defective gasket in some way. This gasket is an aircraft part. Clearly, these allegations fall within the broad and unambiguous aircraft exclusion which prohibits coverage for all of Interface's products that are used in connection with an aircraft or aircraft part.

The case of *Southwire Co. v. Nat'l Union Fire Ins. Co.*, 2008 WL 11320053 (N.D. Ga. July 24, 2008), aff'd by 325 F. App'x 810 (11th Cir. 2009), is most instructive to the instant set of facts. *Southwire* was an insurance coverage dispute where the parties filed cross-motions for summary judgment as to the policy's aircraft exclusion. *Id.* at *1-2. Southwire, the insured, sold thousands of incorrect aluminum alloy wires to a customer, who then forged the wires into a fastener and later sold them to aircraft industry customers. *Id.* at *2-3. Since Southwire sold the wrong wires, the fasteners made from those wires failed as they were being installed on aircrafts and a lawsuit ensued. *Id.* at *4. An approximately $12,000,000 settlement with aircraft industry customers ended the lawsuit and Southwire's insurance company denied coverage for the settlement because of an aircraft exclusion. *Id.* at *6-7. The exclusion in *Southwire* read as follows:

> This Insurance does not apply to **Bodily Injury** or **Property Damage** arising out of the **Products-Completed Operations Hazard** relating to:
>
> 1. Aircraft [including missiles or spacecraft] and any ground support or control equipment used therewith;
>
> 2. Any other goods or products manufactured, sold, handled or distributed by the **Insured** or any services provided or recommended by the **Insured** or by others trading under the **Insured's** name for use in the manufacture, repair, operation or use of any aircraft; or
>
> 3. Any articles furnished by the **Insured** or by others trading under the **Insured's** name and installed in

7

> aircraft or used in connection with aircraft or for spare parts for aircraft including but not limited to ground handling tools and equipment, training aids, instructions, manuals, blueprints, engineering or other advice or service relating to aircraft and any other advice or service relating to such aircraft articles.

*Id.* The court held that "none of the subsections relied upon by [the insurer] preclude coverage in this case." *Id.* at *11. Subsection (1) did not preclude coverage "[b]ecause Southwire did not manufacture, sell, handle, or distribute aircraft." *Id.* at *13. Subsection (2) did not preclude coverage because "Southwire sold wire to [their customer], which then used it to fabricate a defective component of a fastener. Had [the insurer] wished to exclude coverage for Southwire's product later fabricated by other parties into an aircraft part, such as a fastener, it could have defined the term aircraft to include all of its component parts or the raw materials provided by the insured and used by others in the manufacture of aircraft parts." *Id.* at *15-16. Subsection (3) did not preclude coverage because Southwire sold the aluminum to their customer who then forged fasteners and sold them to aircraft industry customers, and since an "'article' is a *particular* item or thing . . . . the aluminum wire was not used in connection with an aircraft; rather, the wire was used by [Southwire's customer] in connection with a fastener." *Id.* at *17. (emphasis added) (citations omitted).

Here, the particular subsection of the aircraft exclusion that precludes coverage reads:

> b. Any of "your products" manufactured for, used in connection with, or incorporated into aircraft, aircraft parts, aircraft equipment or aircraft accessories, including ground handling tools and equipment;

> \*     \*     \*

21. "Your Product"

    a. Means:

8

> 1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
>    a. You;
>    b. Others trading under your name; or
>    c. A person or organization whose business or assets you have acquired; and
>
> 2) Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

(Docket No. 1, Exh. B.) This subsection unambiguously precludes coverage for any product that Interface manufactures, sells, handles, distributes or disposes of that is "manufactured for, used in connection with, or incorporated into aircraft, aircraft parts, aircraft equipment or aircraft accessories . . . ." (*Id.*) Unlike subsection (2) of the exclusion in *Southwire* which the court found did not preclude coverage for *all* of an aircraft's component parts, *Id.* at *15-16, here, the exclusion plainly prohibits coverage for any product used in connection with *any* aircraft parts. Likewise, unlike subsection (3) in *Southwire* which the court held did not preclude coverage because the subsection referred to Southwire's "particular" product rather than all of Southwire's products, *Id.* at *17, here, the exclusion is broad and precludes coverage for *all* of Interface's products that are "manufactured for, used in connection with, or incorporated into . . . aircraft parts."

Therefore, I find that any of Interface's products that are involved with an aircraft or aircraft part are excluded from coverage, and the allegations in the underlying complaint allege just that—that Interface was involved with the production of a defective aircraft part. Accordingly, when examining the four corners of the underlying complaint and the insurance

9

policy, I find that the Aircraft Products and Grounding exclusion unambiguously relieves the Insurer from its duty to provide coverage to Interface for the underlying lawsuit.

Interface attempts to circumvent the aircraft exclusion by relying on two cases, *General Plasma, Inc. v. Reliance Ins. Co.* and *IDS Property Cas. Ins. Co. v. Schonewolf.* In *General Plasma*, the court analyzed a very similar insurance exclusion to the one at issue here, however, the underlying allegations to which the court applied the exclusion addressed the insured's alleged negligent *servicing* of an aircraft engine. *General Plasma, Inc. v. Reliance Ins. Co.*, 2000 WL 72811 (Jan. 11, 2000 Conn. Super. Ct.), abrogated on other grounds by *ACMAT Corp. v. Greater New York Mut. Ins. Co.*, 923 A.2d 697 (Conn. 2007). Thus, because the underlying complaint here alleges Interface was involved with the *production* of an aircraft part, not the servicing of an aircraft, the application of the aircraft exclusion in *General Plasma* is unpersuasive to the instant analysis, and Interface's reliance on it is misplaced.

In *Schonewolf*, an insurance coverage dispute arose over whether "an alcohol-fueled violent encounter" was covered under a policy. *IDS Property Cas. Ins. Co.* v. *Schonewolf*, 111 F.Supp.3d 618, 621 (E.D. Pa. 2015). The underlying lawsuit alleged that the plaintiff was "continuously and violently beaten and kicked about his head and body by . . . [two defendants]." *Id.* (citations omitted). The insurance companies for each defendant sought to be relieved from providing coverage under "substantively identical" insurance agreements which provided coverage for unintentional accidents but excluded coverage for intentional actions that caused bodily injury. *Id.* at 622, 627. The plaintiff in the underlying complaint "carefully couched his complaint in language that avoids labeling [defendants'] actions as intentional" and "the complaint [was] admittedly vague," thus, the court was "unable to rule out the possibility that the conduct may not have been intentional given [the] intoxication," and therefore held that the

10

insurance companies had a duty to defend unless it was later shown that defendants' actions were intentional. *Id.* at 624-26. Here, Interface relies on *Schonewolf* to argue that coverage-triggering allegations exist in the underlying complaint. Contrary to Interface's argument, there are simply no allegations against Interface, other than those regarding Interface's involvement with the defective aircraft part, that could possibly trigger coverage. Therefore, the aircraft exclusion must apply.

Interface makes two additional arguments in support of its position that the Insurer has a duty to provide coverage. First, Interface argues that the underlying allegations against it are meritless and false; thus, the Insurer must provide coverage. Second, Interface argues that the underlying complaint alleges wrongdoing of other defendants, in addition to wrongdoing on the part of Interface, which makes the complaint false and contradictory towards Interface and thereby triggers the Insurer's duty to defend.

Whether the allegations contained in the underlying complaint are meritless or false has no bearing on the aircraft exclusion. Likewise, if other defendants are actually at fault and Interface is not, that fact also has no bearing on the applicability of the aircraft exclusion. As already stated, Interface is involved in the underlying lawsuit because of their alleged involvement with the aircraft part in question. There are simply no other allegations against Interface that could potentially trigger the Insurer's duty to defend.

A recent Third Circuit decision addressed arguments analogous to Interface's arguments here, *Lenick Constr., Inc. v. Selective Way Ins. Co.*, 737 Fed. Appx. 92 (3d Cir. 2018). In *Lenick*, the Third Circuit affirmed the district court's holding that the insurer was precluded from providing coverage to their insured in a lawsuit alleging that the insured, amongst others, conducted faulty carpentry workmanship resulting in housing units suffering leaks and drywall

11

issues. *Id.* at 94. In district court, the insured argued that since the underlying complaint alleged that other defendants had also performed faulty workmanship, meaning that the insured could possibly be found not at fault, the Insurer had to provide coverage. *Id.* at 95 (citing *Lenick Constr. Co.*, 2016 WL 1161571, at *5 (E.D. Pa. Mar. 23, 2016)). The Third Circuit agreed with the district court's rejection of this argument because "[the insured's] *own faulty workmanship* is the only legal theory under which [the insured], as opposed to other contractors or subcontractors, could be found liable" *Id.* (citations omitted). In other words, it did not matter whether other defendants may be found liable because the only way the insured could be found liable is from their own faulty workmanship, which the insurance policy excluded.

After liberally construing the factual allegations of the underlying complaint and taking them as true, the underlying complaint does not have any actual or potential coverage-triggering facts or allegations. No matter whether Interface is truly liable for the defective part or not, the aircraft exclusion applies and the Insurer has no duty to defend Interface in the underlying litigation. Accordingly, I find that there is no genuine issue of material fact as to the applicability of the aircraft exclusion in this matter, and judgment will be granted in favor of Plaintiffs.

## IV. CONCLUSION

For all of the aforementioned reasons, the Insurer is relieved from its duty to provide coverage to Interface for the underlying complaint. Accordingly, Plaintiffs' motion for judgment on the pleadings is granted, and Defendants' motion for partial summary judgment is denied. An appropriate Order dismissing the case follows.